# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAE ROBINSON,

        **Plaintiff,**

        v.                        Case No. 18-CV-380

CO JODI BARRETT, *et al.*,

        **Defendants.**

## REPORT AND RECOMMENDATION

Jae Robinson, a Wisconsin state prisoner who is representing himself, filed a lawsuit under 42 U.S.C. § 1983, alleging that the defendants violated his civil rights at the Waupun Correctional Institution ("WCI"). (ECF No. 8.) The court screened the amended complaint and allowed Robinson to proceed with an Eighth Amendment claim that on December 5, 2017, Jodi Barrett, Don Uherka, and CO John Doe (later identified as Daniel Markelz) showed deliberate indifference toward his suicidal thoughts. (*See* ECF Nos. 9, 19.)

Due to the parties' non-consent to magistrate judge jurisdiction, the case was reassigned to United States District Court Judge William C. Griesbach on May 3, 2018. (ECF No. 12.) The next day, Judge Griesbach referred it back to this court for all pretrial

proceedings. (ECF No. 13.) This matter comes before the court on the defendants' motion for summary judgment. (ECF No. 26.)

## I. RELEVANT FACTS

The court takes the facts in this section from the defendants' Proposed Findings of Fact (ECF No. 30), Robinson's "Statement of Disputed Factual Issues" (ECF No. 38), Robinson's "Declaration in Opposition" (ECF No. 36), and Robinson's sworn amended complaint (ECF No. 8), which the court must construe as an affidavit at the summary judgment stage. *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996).

At the time relevant to this matter, Robinson was an inmate at WCI. (ECF No. 30, ¶ 1.) Defendants Jodi Barrett, Don Uherka, and Daniel Markelz were correctional officers at WCI. (*Id.*, ¶ 2.) Barrett worked in C-range; Markelz worked in B-range; and Uherka worked in the Control Center. (*Id.*, ¶¶ 8-13.)

On December 5, 2017, Robinson was assigned to C-range in the Restrictive Housing Unit ("RHU"). (ECF No. 36, ¶ 4.) Inmates in RHU can have personal property in their cells, but items such as "razors, staples, and other sharp objects," are restricted for the inmates' health and safety. (ECF No. 30, ¶ 7; *see also* ECF No. 37, ¶ 27.) As Barrett was handing out supplies that afternoon, Robinson told her that he felt suicidal. (ECF No. 30, ¶ 14; ECF No. 36, ¶ 4.) Barrett asked Robinson whether he planned to harm himself. (*Id.*; *see also* ECF No. 30, ¶¶ 14-15.) According to Robinson, he responded, "I will cut my wrist and bang my head on my cell door until I am unconscious." (ECF No.

2

36, ¶ 4.) According to Barrett, Robinson responded, "Fuck you Barrett, I don't know you," and asked to speak with a unit sergeant. (ECF No. 30, ¶¶ 15-16.) Both parties agree that Robinson was not actively engaging in self-harm at that time. (*See* ECF No. 30, ¶ 26; *see also* ECF No. 36, ¶¶ 4, 7.)

Barrett gave Robinson a Psychological Services Unit ("PSU") request form and told him to submit the document to speak with the psychologist. (*See* ECF No. 30, ¶¶ 17, 25; *see also* ECF No. 36, ¶ 4.) Although Robinson told Barrett that he needed to speak to someone immediately, she continued handing out supplies. (ECF No. 36, ¶ 4.) Barrett explains that the PSU request form "procedure" is essential for PSU to function properly. (ECF No. 30, ¶¶18-19, 22-23.) She states that PSU staff collect and review PSU request forms daily and reserve daily appointments for inmates to be seen by staff. (*Id.*, ¶¶ 18, 21). Barrett explains, "if security staff called PSU each time an inmate requested, this would be disruptive to the regularly conducted business and activities of PSU." (*Id.*, ¶ 22.)

Barrett says that, after leaving Robinson's cell, she notified the unit sergeant about Robinson's request to speak to him about his suicidal thoughts. (ECF No. 30, ¶ 29.) "Approximately 20-30 minutes later," Robinson made an emergency call-in to the Control Center. (ECF No. 36, ¶ 5). The parties dispute the precise timing of the call (Uherka says the call came in at 2:55 p.m.; Robinson says the call occurred at 3:05 p.m.) (*Id.*; ECF No. 30, ¶ 30), but the dispute is irrelevant for purposes of this motion. Uherka

3

recorded Robinson's call in the emergency call log and noted that Robinson said he "cut myself." (ECF No. 30, ¶¶ 33-34; *see also* ECF No. 31-2.) Uherka explains that the correctional officer assigned to the Control Center is responsible for answering inmate calls but cannot leave the Control Center unattended. (ECF No. 30, ¶¶ 10, 31, 35.) Since he was the only officer assigned to the Control Center at that time, Uherka could not leave the Control Center. (*Id.*, ¶ 36) As a result, Uherka notified Sergeant Winters (not a defendant) of Robinson's call. (ECF No. 30, ¶ 37.)

About ten to twenty minutes later, Robinson placed a second emergency call in to the Control Center. (*See* ECF No. 36, ¶ 6; *see also* ECF No. 30, ¶ 38.) Again, the parties dispute the precise timing of the call (Uherka says the call occurred at 3:25 p.m.; Robinson says the call occurred at 3:09 p.m.), but the exact timing of the call does not matter for purposes of summary judgment. (*Id.*) Uherka recorded Robinson's second call in the emergency call log and noted that Robinson stated, "cut myself. What the fuck?" (ECF No. 30, ¶ 38; *see also* ECF No. 31-2.) Uherka called the unit sergeant's desk and informed Barrett about Robinson's statement. (ECF No. 30, ¶ 39.)

After Robinson placed his second call to the Control Center, he began engaging in self-harm, "cutting my left forearm with a staple." (ECF No. 36, ¶ 7.) About ten to fifteen minutes later, Barrett conducted rounds. (*Id.*, ¶ 8.) Robinson "once again informed CO Barrett of [his] plans for self-harm and showed her [the] cut on [his] forearm." (*Id.*) According to Robinson, Barrett responded, "Oh, it's only a scratch," and

4

continued with her rounds. (*Id.; see also* Griffin Dec., ECF No. 41.) According to Barrett, she did not see Robinson engaging in self-harm or see any injuries on his forearm. (ECF No. 30, ¶ 40-42.) Barrett then went off of C-range to tell the unit sergeant of Robinson's statement. (*Id.*, ¶ 44.)

Over the next roughly half hour Robinson states that he called the Control Center several more times about his suicidal thoughts. (ECF No. 36, ¶¶ 9-14; *see also* ECF No. 40-1 at 2-9.) At 3:26 p.m., Uherka answered Robinson's call but said only "okay" and then hung up. (ECF No. 36, ¶ 9.) About ten minutes later, at 3:35 p.m., Robinson called again, and Uherka asked, "What is your medical emergency?" (*Id.*, ¶ 10.) Robinson asked Uherka, "What is your name?" Uherka responded, "What is my name?" and hung up. (*Id.*) Within the next ten minutes, Robinson made two more calls, first at 3:42 p.m. and then again a minute later, at 3:43 p.m. Uherka "ignored and hung up" when Robinson called to say he was bleeding and needed to be placed on observation. (*Id.*, ¶¶ 12-13.) Within the next twenty minutes, at 3:58 p.m. and again at 4:06 p.m., Robinson made two more calls "to plead for help." Uherka again "ignored" him. (*Id.*, ¶ 14.)

During this time, at around 3:50 p.m., Barrett passed out meal trays to inmates on C-range through the "trap door." (EFC No. 30, ¶ 45.) According to Barrett, Correctional Officer Mikulac (not a defendant) assisted her with the meal pass. (*Id.*, ¶¶ 46-47, 50.) According to Robinson, it was defendant Markelz who assisted with the meal pass. (ECF No. 36, ¶ 15.) According to Robinson, he showed Barrett his self-inflicted injury

5

for a second time, and Barrett again stated, "it's only a scratch." (*Id.*) Robinson then "began hitting [his] head on [the] cell door," and Barrett encouraged him by saying, "Hit it harder! Hit it harder, Robinson!" (*Id*; *see also* Griffin Dec., ECF No. 41.) According to Barrett, she did not see any cuts on Robinson's forearm nor did she see Robinson hitting his head against the door. (ECF No. 30, ¶¶ 49, 56.)

The officers then gave Robinson his meal tray and tried to close the trap door. (ECF No. 30, ¶¶ 46-47.) Robinson states that he "grabbed the trap door, because [he] saw no other way at that point to protect [him]self after pleading for so long." (ECF No. 36, ¶ 16.) According to Robinson, he stated, "I will not let go of the trap unless you go get the sergeant and put me on observation." (*Id*.) Barrett says she told Robinson several times to pull his arm back inside the cell but he refused, stating, "Fuck you Barrett, get me the sergeant now you hermaphrodite bitch!" (ECF No. 30, ¶ 48.)

Barrett finished passing out meal trays, which took about 2-3 minutes, and then notified Sergeant Winters that Robinson was holding his trap door. (ECF No. 30, ¶ 50.) About five minutes later, Sergeant Winters came to Robinson's cell and placed him in observation. (ECF No. 36, ¶ 18.) Barrett prepared a conduct report detailing her interaction with Robinson during mealtime and had no further involvement in this case. (ECF No. 30, ¶¶ 54-55.)

At 4:36 p.m., Nurse Jennifer Kacyon (not a defendant) examined Robinson in RHU. (ECF No. 30, ¶ 70.) According to Kacyon, Robinson told her that he had cut his

forearm and had banged his head on the door 30 minutes before. (*Id.*, ¶ 71; *see also* Kacyon Decl., ECF No. 35, ¶ 12.) According to Kacyon's notes, Robinson's "speech was clear, gait steady, skin warm [and] dry." (*See* Docket No. 30, ¶ 72; *see also* ECF No. 35-1 at 2.) She described Robinson's injury as a "3.5 cm linear superficial scratch to L [forearm], abrasion mid-forehead with mild swelling." (ECF No. 35-1 at 2.) She diagnosed him with "impaired skin integrity" and cleaned the wound. (*Id*. at 3.) She prescribed him ice and ibuprofen. (*Id*.)

Robinson disputes Kacyon's description of his injury as a "superficial scratch," and notes that he attempted to file several HSU requests to correct the record. (*See* ECF No. 37, ¶¶ 73, 76.) Dr. Torria Van Burden approved Robinson's placement on "observation status." (ECF No. 30, ¶¶ 79-82.) Both parties agree that correctional officers do not have authority to place an inmate on observation status. (*See* ECF No. 37, ¶ 94)

The following day, December 6, 2017, at around 8:15 a.m., Psychological Associate Kristina DeBlanc (not a defendant) evaluated Robinson. (ECF No. 30, ¶ 83.) According to DeBlanc's notes, Robinson had "reported feeling depressed and preoccupied by his recent RHU placement and recent life sentence." (*See* ECF No. 34-1 at 1.) Robinson stated that his anxiety was "up" and he "was trying to get the attention of staff so he could be moved to observation." *Id*. "He reported his perception that this

took up to two hours." *Id*. Robinson does not dispute this portion of DeBlanc's notes. (*See* ECF No. 37, ¶ 85.)

According to the rest of DeBlanc's notes, Robinson also explained that he was "frustrated" because he had been on C-range for a while and had been seeing fellow inmates move to a different program and receive electronics. (ECF No. 34-1 at 3.) He indicated that he was not getting either of these things and he "reacted." (*Id*.) He reported interest in working it out with security, with plans to write requests. (*Id*.) Robinson denies having this conversation with DeBlanc, noting that he "knows PSU has nothing to do with Step placement." (ECF No. 37, ¶¶ 86-87.) DeBlanc removed Robinson from observation status at around 8:30 a.m. that day. (*See* ECF No. 34-1 at 3.)

Dr. Van Buren followed up with Robinson the following day, December 7, 2017. (ECF No. 30, ¶ 90.) According to Dr. Van Buren's notes, Robinson stated that he was "alright" and denied suicidal ideation, including urges to cut himself. (ECF No. 34-1 at 3.) Dr. Van Buren's notes indicate that Robinson was "engag[ing] in self-harm because he was upset about a recent conduct report." (*Id*.) Robinson denies making this statement. (ECF No. 37, ¶ 90). Dr. Van Buren's "treatment plan" stated, "Mr. Robinson will continue to be seen for clinical monitoring…he will also be seen within one week for a follow-up from his release from observation status." (ECF No. 34-1 at 3.)

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

A party asserting that a fact is genuinely disputed, or not disputed, must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III. ANALYSIS

To prevail with a claim under 42 U.S.C. § 1983, Robinson must establish that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)).

1. Section 1983's Personal Involvement Requirement

"For a defendant to be liable under section 1983, [he] must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cnty.*, 830 F.3d 464, 469 (7th Cir. 2016)). "An official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). He or she "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)).

Markelz seeks summary judgment based on the fact that he had no interactions with Robinson on December 5, 2017. Markelz provides a statement swearing that he was not the individual who helped Barrett with the meal tray pass that day in C-range during second shift. (*See* Markelz Dec., ECF No. 33, ¶¶ 6-11.) He states that he was

assigned to B-range that day and was doing supply-pass, meal pass, and other duties on B-range at the time relevant to these claims. (*Id.*, ¶¶ 7-8.) Markelz also states that he did not observe the interaction between Barrett and Robinson that day and was not otherwise involved in this case. (*Id.*, ¶¶10-11.)

Robinson disputes Markelz's statements. (*See* ECF No. 37, ¶¶ 65, 68-69.) An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. *See* Fed. R. Civ. P. 56(c)(4). Robinson initially identified Markelz in his complaint as a "John Doe" because he received his meal tray through a trap door and did not personally interact with the individual who assisted Barrett. (ECF No. 1, ¶ 17.) Barrett provided a declaration swearing that Mikulac, not Markelz, was the individual who assisted her passing out meal trays on December 5, 2017. (ECF No. 32, ¶ 27.) Robinson concedes that Markelz worked on B-range during second shift on December 5, 2017 (ECF No. 37, ¶ 64), but speculates that Markelz also "could have" participated in meal-pass on C-range. (*Id.*) He reiterates that "Markelz did help pass out trays" (*Id.*, ¶ 65) and "Officer Markelz was there" (*Id.*, ¶ 68), but he does not allege that he personally saw, heard, or interacted with Markelz through the trap door. Robinson's speculation that Markelz also could have been on the other side of the cell door is not sufficient to create a genuine issue of

11

material fact at summary judgment. Accordingly, the court will recommend granting defendants' motion for summary judgment as to Robinson's claims against Markelz.

   2. Eight Amendment Deliberate Indifference

Prison officials violate the Eighth Amendment when their conduct demonstrates deliberate indifference to a substantial risk of serious harm to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The plaintiff must establish that: "(1) the harm that befell him was objectively, sufficiently serious, and posed a substantial risk to his health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to his health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Farmer*, 511 U.S. at 832). Attempted suicide is a substantial risk to an inmate's health or safety. *Id*.

"Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide[,] and (2) intentionally disregarded the risk." *Collins*, 462 F.3d at 761 (citing *Matos el rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003). The defendant must be "cognizant of the significant likelihood that an inmate may imminently seek to take his own life[.]" *Id*. (citing *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001)). "While prison staff are under an obligation to protect inmates from self-harm… [a] risk of future harm must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can

be liable for ignoring that risk." *Shipp v. Wolf*, No. 17-C-560, 2018 WL 2416579, at *2 (E.D. Wis. May 29, 2018) (internal citations omitted).

"To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety." *Collins*, 462 F.3d at 762 (quoting *Matos*, 335 F.3d at 556). "A defendant with knowledge of a risk need not 'take perfect action or even reasonable action[,] ... his [or her] action must be reckless before § 1983 liability can be found.'" *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir.2003).

*a. Defendant Uherka*

Uherka asserts that he responded appropriately to Robinson's emergency calls. He states that he was the only officer assigned to the Control Center when Robinson made his calls and could not leave the Control Center unattended. (ECF No. 31, ¶ 13.) Uherka radioed staff members (Sergeant Winters and Barrett), who were physically able to go to Robinson's cell to resolve the problem. (*Id.*, ¶ 12.) Uherka states that he expects staff members to take appropriate actions once he notifies them of an inmate's issue. (*Id.*, ¶ 14.)

Robinson admits that Uherka could not physically leave the control center when he called. (ECF No. 37, ¶¶ 35-36.) He also admits that he "cannot speculate on whether Uherka called the sergeants desk or not," and that he "cannot speculate on correctional officers' duties on interacting with one another." (*Id.*, ¶¶ 39, 60-61.) Robinson's

13

complaint against Uherka appears to be that he called Uherka "8 different times" in a two-hour period (ECF No. 38, ¶ 2) and Uherka had a rude and dismissive tone each time.

Uherka took steps to respond to Robinson's complaints. Uherka radioed staff after he received Robinson's calls, and Barrett and Sergeant Winters showed up at Robinson's cell to address the issue. According to Robinson's own statement, Barrett arrived at his cell ten to fifteen minutes after he made his second emergency all in to Uherka. (ECF No. 36, ¶¶ 6-8.) Sergeant Winters arrived at Robinson's cell about five minutes after Barrett contacted him. (*Id.*, ¶¶ 17-18.) The constitution does not require Uherka to do more.

Further, the court agrees that Uherka is entitled to rely on staff members to take appropriate actions once he notifies them of an inmate's issue. Robinson cannot demand that Uherka do another staff member's job. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights…[and] no prisoner is entitled to insist that one employee do another's job."). Uherka acted to the extent of his abilities to resolve Robinson's complaint, and he cannot be held accountable for how Sergeant Winters and Barrett ultimately resolved the issue.

Finally, Uherka's curt and dismissive tone over the phone also does not violate the constitution. *See Phelps v. Phillips*, No. 314CV00891MJRSCW, 2018 WL 1517765, at *5

(S.D. Ill. Mar. 28, 2018) ("Even if [the defendant] did make rude comments to Plaintiff throughout the incident, the use of 'derogatory language, while unprofessional and deplorable, does not violate the Constitution.'"). While Uherka's tone may have been off-putting to Robinson, he promptly took actions to resolve Robinson's complaint. Based on this record, no reasonable jury could conclude that Uherka showed deliberate indifference to Robinson's suicidal thoughts. Therefore, the court will recommend granting summary judgment on Robinson's claims against Uherka.

### b. Defendant Barrett

Barrett states that she responded appropriately to Robinson's suicidal thoughts. She explains that she gave Robinson a PSU form, monitored him, called her supervisor, and followed prison protocol regarding suicidal inmates. (ECF No. 32, ¶¶ 13, 19, 21, 23-26, and 40-41.) She also states that Robinson never told her specific details about his "plans" to harm himself. (*Id.*, ¶¶ 11-12 and 23-25.) Barret states that she "had no reason to believe that Robinson had any items in his possession that he could use to harm himself with." (*Id.*, ¶ 19.)

Robinson alleges that he told Barrett, "I will cut my wrist and bang my head on my cell door until I am unconscious." (ECF No. 36, ¶ 4.) Robinson concedes that Barrett gave him a PSU request form to speak to a psychologist. (*Id.*) At that time, Barrett's decision to give him a PSU request form was appropriate given that Robinson was not actively engaging in self-harm and she had no reason to believe that Robinson

15

possessed objects in the restricted housing unit with which he could harm himself. *See Shipp v. Wolf*, No. 17-C-560, 2018 WL 2416579, at *2 (E.D. Wis. May 29, 2018) ("Because inmates in RHU are limited in the items they may possess in restrictive housing, it is not unreasonable for an officer to believe that the inmate did not possess contraband that would aid him in self harm.").

Barrett appropriately considered the needs of the prison (a well-functioning PSU) against Robinson's statements regarding self-harm. Barrett explains that "if security staff called PSU each time an inmate requested, this would be disruptive to the regularly conducted business and activities of PSU." (ECF No. 30, ¶ 22.) Because Barrett had no reason to believe that "the risk of future harm was sure or very likely" at that time, her decision to follow the PSU request form procedure was an appropriate response.

Later in the day, Robinson allegedly showed Barrett the lacerations on his forearm and started banging his head on the cell door. According to Robinson, Barrett stated, "Oh it's only a scratch," and yelled, "Hit it harder! Hit it harder, Robinson!" (ECF No. 36, ¶ 15.) Assuming these allegations are true, as the court must at summary judgment, Robinson's own version of events shows that Barrett promptly called Sergeant Winters, who arrived at Robinson's cell within five minutes of the incident. (*Id.*, ¶ 18.) Robinson admits that, within 30 minutes of banging his head on the wall, Psychological Associate Kristina DeBlanc was examining him in RHU. (ECF No. 37, ¶

71.) Barrett's comments to Robinson may have been unprofessional and inappropriate, but she took prompt and appropriate actions in response to his complaints of self-harm. Based on this record, no reasonable jury could conclude that Barrett showed deliberate indifference toward Robinson's suicidal thoughts.

Therefore, the court recommends granting summary judgment to defendants on Robinson's claims against Barrett.

## IV. CONCLUSION

**WHEREFORE, IT IS HEREBY RECOMMENDED** that the defendants' motion for summary judgment (ECF No. 26) be **GRANTED**. A party may serve and file specific written objections to the proposed findings and recommendations within 14 days after being served with a copy of the recommended disposition. *See* Fed. R. Civ. P. 72(b)(2). A party may respond to another party's objections within 14 days after being served with a copy. *Id*.

Dated at Milwaukee, Wisconsin this 26th day of April, 2019.

*William E. Duffin*
WILLIAM E. DUFFIN
U.S. Magistrate Judge